**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

ROBERT EVERSOLE,                                          Case No. 1:12-cv-592

            Plaintiff,                                          Beckwith, J.
                                                               Bowman, M.J.
        v.

COMMISSIONER OF SOCIAL SECURITY,

            Defendant.

**REPORT AND RECOMMENDATION**

Plaintiff Robert Eversole filed this Social Security appeal in order to challenge the
Defendant's determination that he is not disabled.  *See* 42 U.S.C. §405(g).  Proceeding
through counsel, Plaintiff presents four claims of error, all of which the Defendant
disputes.  After being granted an extension of time in which to file a reply memorandum,
Plaintiff chose not to file a reply.  As explained below, I conclude that the finding of non-
disability should be AFFIRMED because it is supported by substantial evidence in the
administrative record.

### I. Summary of Administrative Record

Plaintiff filed an application for Disability Insurance Benefits ("DIB") in December
2008,[1] alleging disability beginning on June 24, 2006 due to both mental and physical
impairments.  After Plaintiff's application was denied initially and upon reconsideration,

---

[1]Plaintiff's 2008 application was his second DIB application.  His first claim for benefits was denied at the
initial level in 2007, and he did not appeal.  (Tr. 181).  Ordinarily an unappealed decision is *res judicata*
for the time period covered by that decision. Plaintiff argued before the ALJ that his prior claim should be
reopened, but presents no similar argument to this Court.

he requested a hearing *de novo* before an Administrative Law Judge ("ALJ").  At a hearing held in October 2010, ALJ Deborah Smith heard testimony from Plaintiff and from a vocational expert.  On November 24, 2010, the ALJ denied Plaintiff's application in a written decision, concluding that Plaintiff was not disabled.  (Tr. 15-29).  The Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision as the Defendant's final determination.

Plaintiff was 53 years old at the time of the ALJ's decision, with a limited education, having dropped out of school after completing the tenth grade. (Tr. 44).  He is insured for Title II benefit purposes through December 2011.  (Tr. 15).  Although he previously worked as a warehouse worker and truck driver, Plaintiff has not engaged in substantial gainful activity since his alleged disability date.  Based upon the record and testimony, the ALJ found that Plaintiff has the severe impairment of "cervical and lumbar spondylosis." (Tr. 17).  This impairment did not alone, or in combination with any other impairments, meet or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  (Tr. 20).  Rather, the ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to perform a range of light work, subject to the following additional limitations:

> [T]he claimant could sit approximately six hours in an eight-hour workday and stand/walk about six hours in an eight-hour workday.  He could occasionally climb ramps and/or stairs, balance, stoop, kneel, and/or crouch; but he should never climb ladders, ropes, and/or scaffolds or crawl.  Further, the claimant should avoid concentrated exposure to hazards such as, unprotected heights and/or use of moving machinery.  There are no limitations from a mental standpoint as he has only mild (defined as less than moderate) restriction of activities of daily living; mild difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence, or pace.

(Tr. 21).   The ALJ concluded that, while precluded from his past work (Tr. 26), Plaintiff could still perform "a wide range of representative light, unskilled" jobs that exist in significant numbers in the national economy.   (Tr. 27-28).   Accordingly, the ALJ determined that Plaintiff is not under disability, as defined in the Social Security Regulations, and is not entitled to DIB.  (Tr. 28).

On appeal to this Court, Plaintiff argues that the ALJ erred: (1) by failing to account for Plaintiff's mental impairments in formulating his RFC; (2) by failing to fully and fairly develop the record concerning Plaintiff's IQ; (3) by failing to address Dr. Staskavich's opinion, and improperly weighing Dr. Ringel's opinion; and (4) by improperly assessing Plaintiff's credibility.  None of the asserted errors requires remand.

## II.  Analysis

### A.  Judicial Standard of Review

To be eligible for social security benefits, a claimant must be under a "disability." *See* 42 U.S.C. §1382c(a).  Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal

quotation omitted).  In conducting this review, the court should consider the record as a whole.  *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978).  If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability.  *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).  As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion . . . . The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts.  If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.*  (citations omitted).

In considering an application for benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his or her past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform his or her past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy.  *See Combs v. Commissioner of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.   However, a plaintiff bears the ultimate burden to prove by sufficient evidence that he or she is entitled to disability benefits.  20 C.F.R. § 404.1512(a).

**B. Plaintiff's Assertions of Error**

**1. Evaluation of Plaintiff's Mental Impairment**

Plaintiff first argues that the ALJ erred by failing to find his allegedly low IQ and depression as "severe" impairments, or alternatively, by failing to adequately consider those non-severe impairments in the overall analysis of his claim.

**a. Depression/Mood Disorder**

In his initial application for benefits, Plaintiff alleged disability only due to "neck and lower back injuries from multiple car accidents." (*See* Tr. 156, 161). Later, he alluded to depression and anger issues secondary to his back and neck pain (*see* Tr. 176, 179), and therefore was referred by the agency for a consulting psychological exam in February 2007. Although Steve Sparks, Ph.D. diagnosed "Adjustment disorder with Depression," he opined that Plaintiff's impairment was not severe. (Tr. 215, 313-320). A second consulting exam was performed on June 17, 2009. (Tr. 471-473).

The first time that Plaintiff clearly alleged a severe mental impairment was shortly before his evidentiary hearing. (Tr. 19). At the hearing, counsel explained that Plaintiff was now claiming a substantial psychological impairment for which he had recently begun treatment. The ALJ responded: "So your argument is based on a one time evaluation two days before the hearing and I'm supposed to find this man disabled because of psych problems, is that, is that your argument, Counsel?" (Tr. 50). In her written opinion, the ALJ pointed out that, "[a]t the reconsideration level, the claimant was afforded the opportunity to expound on his mental impairments, but declined, instead noting only memory problems that he attributed to age." (Tr. 19, citing Tr. 215).

Plaintiff complains that the ALJ erred by citing Plaintiff's failure to make any earlier claim, because Plaintiff did refer to symptoms during the disability application process. Having examined those references (Tr. 169-172, 176, 178, 230, 232), the undersigned finds that substantial evidence supports the ALJ's analysis. The references were brief and fleeting, and relate Plaintiff's mental "symptoms" to his ongoing back and neck pain.[2] This relatively spare evidence does nothing to undercut the ALJ's analysis that Plaintiff's failure to earlier report any significant symptoms supports her conclusion that his mental impairment was not severe.

The ALJ also cited Plaintiff's failure to seek any treatment (or even an evaluation) until 2007, when a consulting examination "was performed at the behest of the Administration" as additional support for her conclusion that his alleged depression was not severe. (Tr. 19). A failure to seek treatment may be considered as evidence against a finding of disability, but the Commissioner must consider the reasons for that failure, including lack of funds or disabling mental illness.

Plaintiff protests that here, his failure to seek treatment falls "under the exception to the rule" because of his financial and cognitive limitations. (Doc. 11 at 18). First, he postulates that his "cognitive impairments no doubt played a factor" because consulting sources described his insight and judgment as only "fair," (Tr. 471-475, 485-494), and because he reported that he believed his depressive symptoms were a normal response to his job loss and chronic pain. However, as discussed below, the record as a whole provides substantial evidence to support the ALJ's determination that Plaintiff's

---

[2]On January 6, 2007, Plaintiff responded to a question concerning how well he gets along with others by stating, "The more I hurt the more hateful I can be." (Tr. 169). In a response on a later disability questionnaire, he stated that he has "become more angry and frustrated" since May 2009. (Tr. 230).

failure to seek treatment was not itself caused by any severe mental illness or cognitive limitation.   While Plaintiff's insight and judgment may be not be good, Plaintiff's speculative argument does not undermine the validity of the ALJ's analysis.

Plaintiff also asserts that he could not afford treatment.   In February 2007, consulting psychologist Dr. Sparks refers to Plaintiff's report that he had lacked funds to fill his narcotic pain prescriptions for "several days." In January 2009, Plaintiff reported to consulting physician Dr. Fritzhand that he hadn't seen a doctor in two and a half or three years due to a lack of insurance, and that he had become homeless.  (Tr. 435). However, other medical records refute Plaintiff's 2009 report that he hadn't seen a doctor since 2006, and both Dr. Fritzhand and other examining sources noted Plaintiff's inconsistent statements, lack of cooperation, and other serious credibility issues.  The ALJ carefully considered Plaintiff's asserted inability to pay for treatment in the context of the record as a whole:

> [F]or much of the relevant period, the claimant was not receiving any medical treatment [even for his alleged disabling back pain] and not taking prescribed medications…Although the claimant alleged that he could not afford additional treatment, he admitting smoking cigarettes [on] a daily basis; therefore, it is reasonable to assume he can afford some treatment. Nevertheless, if finances were a problem, there is no evidence that he attempted to procure free or discounted examinations through any government assisted programs.  Moreover, when provided free treatment at the behest of the Administration, he was completely uncooperative….

(Tr. 23).

Most importantly, the ALJ concluded that Plaintiff had failed to meet his "burden of establishing any emotional or mental problems."  (Tr. 18).  The ALJ painstakingly reviewed the broad functional areas known as the "paragraph B" criteria, but determined that Plaintiff had only mild restrictions in activities of daily living, maintaining social

functioning, and in maintaining concentration, persistence or pace, and no episodes of decompensation. (Tr. 18). Therefore, Plaintiff's mental impairment was not severe. (Tr. 19). Although Plaintiff valiantly refers this Court to brief references to psychological symptoms and pulls out the most favorable phrases from the consulting psychological reports, reading those reports in total only serves to confirm that substantial evidence exists to support the ALJ's conclusion.

Regardless of the severity of the mental impairment, the ALJ also carefully considered all of the evidence prior to concluding that it did not warrant the inclusion of limitations in Plaintiff's RFC. Plaintiff concedes that any error in failing to find a "severe" impairment is generally harmless, so long as the ALJ identifies at least one severe impairment and proceeds to the next step in the analysis, as was done here. Nevertheless, Plaintiff contends that "it seems clear that limitations should have been added to the RFC" (Doc. 11 at 18). Plaintiff asserts that "a limitation to simple, repetitive tasks is the bare minimum required to accommodate Plaintiff's level of intellectual functioning." (Doc. 11 at 18-19). He further contends that he should have "limitations on the level of reading and math required for the job and limitations on the extent of contact and communication with others." (*Id.* at 19).

As the ALJ noted, Dr. Sparks observed only a mild depressed affect, with nearly all other findings within normal limits, and a Global Assessment of Functioning ("GAF") score of 68. (Tr. 19). Even though the ALJ determined that Plaintiff's alleged mental impairment had no impact on his ability to work, the ALJ pointed out that if limitations were added for depression, Plaintiff still would not be disabled. "Even assuming arguendo, the undersigned found the claimant's mental impairment 'severe' (although

the evidence does not warrant such a finding) and limited him to no work with the general public and only superficial contact with co-workers" the VE testified that he could perform the enumerated jobs. (Tr. 27). Aside from a 2009 consultant whose report was rejected, no medical expert opined that Plaintiff required additional mental limitations. This Court would add that the vast majority of unskilled jobs, including the assembler and packer job to which the VE testified, would involve only a limited level of reading and math. Those same jobs appear to involve only "simple repetitive tasks."

### b. Alleged Cognitive Impairment

In addition to claiming that he suffers from severe depression, Plaintiff contends the ALJ erred in failing to find a "severe" cognitive impairment. Like the claim of depression, Plaintiff presented this claim shortly before the evidentiary hearing. Listing §12.05C, contained in 20 C.F.R. Part 404, Subpart P, Appendix 1, pertains to mild mental retardation and states:

> 12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports an onset of the impairment before age 22. The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> ...C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

*Id.* If a claimant shows that he meets or equals Listing 12.05C for mild mental retardation, then he is presumed to be disabled. However, in this case, the ALJ found that, even if Plaintiff had borderline instead of normal intellectual functioning, no severe cognitive impairment existed. (Tr. 20). Heavily relying upon a single IQ score of 70 found by Catherine Staskavich, Ph.D., during her 2009 consulting examination, Plaintiff

argues that he either meets the criteria for mild mental retardation and/or that additional cognitive limitations should have been imposed.

In *Foster v. Halter*, 279 F.3d 348 (6th Cir. 2001), the Sixth Circuit clarified in addition to a qualifying IQ score, a claimant is required to satisfy the "adaptive functioning" standard in order to meet Listing 12.05C. In *Foster*, the plaintiff had dropped out after the ninth grade and had two sets of qualifying IQ scores, but there was no evidence of deficits in adaptive functioning before age 22, and the plaintiff's prior work demonstrated "that she had the ability to perform relatively complicated tasks." *Id.* at 355. Thus, for Plaintiff to meet Listing 12.05, he must show: (1) subaverage intellectual functioning; (2) onset before age twenty-two; and (3) adaptive-skills limitations, in addition to the criteria under Section 12.05C. "Adaptive functioning" involves an individual's "effectiveness in areas such as social skills, communication, and daily living skills, and how well the person meets the standards of personal independence and social responsibility expected of his or her age by his or her cultural group." *Heller v. Doe by Doe*, 509 U.S. 312, 329, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993), citing Diagnostic and Statistical Manual of Mental Disorders, pp. 28–29 (3d rev. ed.1987). To that extent, adaptive functioning differs from "academic" functioning. *West v. Comm'r of Soc. Sec.*, 240 Fed. Appx. 692, 698 (6th Cir.2007) (citing *Heller*, and holding that plaintiff who held a longterm, full-time job, with many activities of daily living, did not show deficiencies in adaptive functioning). "The American Psychiatric Association defines adaptive-skills limitations as '[c]oncurrent deficits or impairments ... in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional

academic skills, work, leisure, health, and safety.' " *Hayes v. Comm'r of Soc. Sec.*, 357

Fed. Appx. 672, 677 (6th Cir.2009), citing DSM–IV–Tr at 45.

In rejecting Plaintiff's contention that he suffered from any "severe" cognitive impairment, much less that he met Listing 12.05C, the ALJ relied in part on the 2007 IQ test administered by Dr. Sparks, which yielded a verbal IQ score of 80, Performance IQ of 78, and Full Scale IQ of 77.  (Tr. 19).  Despite scores in the borderline range, Dr. Sparks considered Plaintiff to have average cognitive abilities.  Citing Plaintiff's poor cooperation and other variables, Dr. Sparks opined that his IQ test results could be an underestimate of Plaintiff's true abilities.  (Tr. 19).  Although Dr. Staskavich reported three slightly lower scores after administering a second IQ test in 2009, two of those scores also were in the borderline range; just one equaled 70, the upper limit for mild mental retardation.  Yet even Dr. Staskavich diagnosed borderline intellectual functioning, not mild mental retardation.  No psychologist or physician has ever diagnosed retardation in a manner that would satisfy Listing 12.05C.

Although the ALJ failed to specifically discuss the single score of 70, the ALJ emphasized that her decision that Plaintiff had no severe cognitive impairment was based in large part on Plaintiff's "significant level of adaptive functioning," including his employment for more than twenty years performing semi-skilled work related tasks, his report that he was an "expert" at computer repair, and demonstrated abilities to attend appointments and find his own way without difficulty.  (Tr. 20).  The record reflects that Plaintiff has been able to develop and maintain relationships, having been married three times for varying numbers of years, with five children – two of whom he reported raising alone after his second wife abandoned the family.    (Tr. 486).    Plaintiff lived

independently, despite the onset of homelessness before the hearing,[3] reported being able to manage his own money, and there was "no evidence he required supervision or assistance" in activities of daily living. (Tr. 20). The ALJ also relied on the fact that Dr. Sparks noted only mild impairments, with no impairments in Plaintiff's abilities to understand, retain, and follow instructions, or in his ability to maintain attention to perform simple, repetitive tasks. (*Id.*). A second agency consultant similarly found no severe mental impairment. The ALJ concluded that both consultants' opinions were "well supported by clinical findings upon evaluation," with "no other evidence …contrary to their findings" other than Dr. Staskavich's assessment. (*Id.*).

The ALJ determined that the mental residual functional capacity assessment by consultant Catherine Staskavich, Ph.D. was entitled to "little weight," on grounds that her opinion relied almost exclusively on Plaintiff's "subjective reports of symptoms and limitations." (Tr. 20). The ALJ also noted that Dr. Staskavich's "terms of the residual functional capacity" were not "well defined," which rendered the opinion "less persuasive." (*Id.*). Plaintiff argues that the ALJ improperly acted in place of a consulting medical source when she discounted the lower scores found by Dr. Staskavich as "likely…attributable to a lack of educational history and not a disabling intervening cognitive deficit and/or defect." (Tr. 19). While Plaintiff argues that this statement constitutes an improper medical opinion,[4] an equally supportable interpretation is that

_____

[3]As with many of Plaintiff's statements, the date on which he became homeless is unclear. At his February 2007 examination, Plaintiff reported that he then lived with his wife and daughter in a house that he owned. (Tr. 314). In an application form dated December 17, 2008 he also reported activities of daily living in a home environment. (Tr. 214). However, at the hearing in October 2010, Plaintiff testified that he had been homeless for 4 years. (Tr. 42).
[4]Many courts have commented on the generally accepted stability of adult IQ scores over time, absent some intervening event such as a brain injury. By contrast, a "low IQ score, in itself, is not evidence of

the ALJ reasonably resolved conflicting IQ scores. *See Bailey v. Com'r of Soc. Sec.*, Case No. 1:12-cv-140, 2013 WL 2286962 (May 23, 2013)(Spiegel, J., holding that ALJ properly evaluated conflicting evidence concerning IQ scores, despite scores below 70, including one of 59). In addition, the ALJ's other reasons for rejecting Dr. Staskavich's opinions were well supported, including that Dr. Staskavich did not diagnose mental retardation, the inconsistency of her scores with Dr. Sparks' report and other evidence of record, such as Plaintiff's adaptive functioning and Plaintiff's work history.

Plaintiff argues that the record supports a conclusion that his adaptive functioning was reduced, given Dr. Sparks' prior report that Plaintiff's wife and daughter performed household chores, and that Plaintiff presented with poor hygiene and body odor and is now homeless. (Tr. 318). However, the record also reflects that Plaintiff has a driver's license, reported raising two daughters by himself, reported no difficulties in getting along with others or in maintaining employment based on any cognitive impairment, and reported that he was able to maintain his activities of daily living without assistance. Plaintiff's apparently poor hygiene or current living conditions do not compare to the substantial evidence that favors the ALJ's decision. Even Dr. Staskavich stated that Plaintiff was "not significantly limited" in his ability "to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness." (Tr. 471).

Plaintiff notes that he reported being in special education classes, and Dr. Sparks references confusing collateral records that implied he may still have been in high school in his mid-20's. But the same report reflects "primarily grades of A and B." (Tr.

---

'subaverage intellectual functioning or deficits in …adaptive functioning during [the plaintiff's] developmental period." *Bailey*, 2013 WL 2286962 at *5 (quoting *Turner v. Com'r of Soc. Sec.*, 381 Fed. Appx. 488, 491-492 (6th Cir. 2010)).

319). Dr. Sparks also noted that Plaintiff had "a group of friends with whom he socialized" in school, adding to evidence of a lack of any deficit in interpersonal skills. (Tr. 314). Plaintiff points to his refusal of recommended testing for a possible adrenal gland tumor as "a sign that Plaintiff does not make wise choices." However, a decision not to undergo testing "because he does not want to know and is not afraid of death," (Tr. 319) is hardly the type of evidence that would provide grounds for remand in this case. Likewise, that Dr. Sparks appears to have questioned Plaintiff's testimony that he was an "expert" in computer repair despite a lack of training (Tr. 316), does not mean that the ALJ committed reversible error by citing that statement among the myriad of factors supporting her decision that Plaintiff was not cognitively impaired.

### 2. Alleged Failure to Develop the Record By Obtaining School Records

Although Plaintiff presented his Listing 12.05C claim to the ALJ, different counsel represents Plaintiff in this appeal than represented him at the evidentiary hearing. In general, an ALJ must fully review all relevant records presented to him or her, and develop the record further only if there is insufficient evidence to determine an issue. Plaintiff acknowledges that a heightened duty to develop the record generally exists only when a claimant appears *pro se*, but nevertheless argues that in this case, the ALJ should have *sua sponte* requested Plaintiff's school records, or asked prior counsel to do so, in order to more closely review whether Plaintiff had any deficits in adaptive functioning which manifested themselves prior to age 22. As support for this argument, Plaintiff again focuses heavily on the single IQ score found by Dr. Staskavich. Additionally, Plaintiff refers to his report that he was in special education classes, and Dr. Sparks' brief reference to adaptive functioning, wherein he stated that although the

14

"clinical impression was that cognitive functioning was within normal limits," Plaintiff's "[a]daptive functioning was likely slightly lower."  (Tr. 318).  Based upon the substantial evidence that exists in the record that supports the ALJ's decision in this case, the undersigned finds no error in the ALJ's failure to seek out additional school records.

It was the Plaintiff's burden to establish that he met or equaled Listing 12.05. Plaintiff's prior counsel did not submit school records, nor did he seek additional time to submit such records.  Courts in this circuit have repeatedly noted, most recently as this Court did in *Bailey,* that the mere fact that a plaintiff was enrolled in special education classes does not conclusively establish the onset of deficits in adaptive functioning prior to the age of 22.  *See Bailey*, 2013 WL 2286962 at *6 (collecting cases).  The same body of case law firmly establishes that where a plaintiff has been able to live independently and maintain full-time employment for many years, as in this case, an ALJ's decision that a plaintiff does not meet Listing 12.05, based on his or her level of adaptive functioning, generally will be upheld as supported by substantial evidence. (*Id*.).  In short, this is not the type of case in which the evidence was so close and ambiguous that the ALJ was required to independently seek out additional evidence.

### 3.  Alleged Errors In Weighing Medical Evidence

In his third assignment of error, Plaintiff attacks the ALJ's decision to discount the opinions of Dr. Ringel and Dr. Staskavich.  Plaintiff asserts that remand is required because the ALJ "failed entirely to even mention Dr. Staskavich's professional medical opinion," which supported Plaintiff's claim of cognitive impairment and severe depression.  (Doc. 11 at 23).  The argument concerning Dr. Staskavich is flatly refuted by the record.  The ALJ not only discussed Dr. Staskavich's consulting opinion, but

explained that she was giving it "little weight" for multiple reasons, discussed both by the ALJ in her opinion and confirmed by the undersigned's analysis of the same evidence. (Tr. 20).  Although she referred to the exhibit number (19F) rather than Dr. Staskavich's name, the ALJ further discussed the "little weight" given to Dr. Staskavich's opinions and the basis for that decision on page 12 of her opinion.  (Tr. 26, *see also* Tr. 19).

Likewise, the undersigned finds no error in the rejection of Dr. Ringel's extreme and unsupported opinions.  After discussing the medical evidence offered by multiple consulting physicians who examined Plaintiff and reviewed his records, the ALJ concluded that the RFC opinions offered by Dr. Ringel on March 26, 2010 were entitled to "no weight," despite Dr. Ringel's status as a treating physician:

> Dr. Ringel treated the claimant only three times before he rendered his assessment; he therefore relied quite heavily on subjective complaints, and seemed to uncritically accept as true most, if not all, of the claimant's subjective reports of symptoms and limitations.  Even the claimant's representative acknowledged sparse treatment notes as stated above. Dr. Ringel also diagnosed herniated discs, but the record documents no imaging and/or electro-imaging studies to support his diagnosis and the neurologic exams have been unremarkable.  Further, Dr. Ringel's musculoskeletal and neurological examinations were equally within normal limits….
>
> Dr. Ringel also provided limitations secondary to impairments that do not even exist.  For example, he restricted the claimant's reaching, handling, and fingering; yet, the claimant does not have any type of hand/upper extremity impairment to warrant such a finding.  He also opined that the claimant could sit only thirty minutes in an eight-hour workday and stand/walk approximately thirty minutes in an eight-hour workday.  The claimant would essentially be bed ridden if these findings were accepted. Ultimately, Dr. Ringel's opinion is unsupported by the substantial evidence of record and further rendered less persuasive due to a very brief treatment history.

(Tr. 25-26).

The relevant regulation provides: "[i]f we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight."  20 C.F.R.  §404.1527(d)(2); *see also Warner v. Com'r of Soc. Sec.,* 375 F.3d 387, 390 (6th Cir. 2004).

Conversely, if a treating physician's opinions are not "well-supported" or are inconsistent with other substantial evidence, then they need not be given controlling weight.  Soc. Sec. Ruling 96-2p, 1996 WL 374188, at *2 (July 2, 1996).  In such cases, the ALJ should review additional factors to determine how much weight should be afforded to the opinion.  These factors include, but are not limited to: "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician."  *See Blakley v. Com'r of Social Security*, 581 F.3d 399, 406 (6th Cir. 2009); *see also* 20 C.F.R. §404.1527(d)(2).  The ALJ complied with the regulatory framework by articulating in detail why she was giving Dr. Ringel's unsupported RFC opinions "no weight."

Plaintiff argues that the ALJ used "flawed" logic.  Plaintiff concedes that Dr. Ringel "treated" Plaintiff only three times, but suggests that because Dr. Ringel noted that Plaintiff was to return every two weeks for an updated prescription of his narcotic pain medication, Dr. Ringel must have had "several opportunities" to additionally "examine and observe" the Plaintiff.  However, the referenced notation does not support Plaintiff's hypothesis.  Merely requiring a patient to return for periodic prescriptions does

not mean that he complied with that requirement or that he was actually examined by Dr. Ringel every two weeks. Indeed, Dr. Ringel's records contradict that hypothesis.

Plaintiff alternatively argues that even if Dr. Ringel examined Plaintiff just three times, that is still more than any of the consultants, including examining consultants Drs. Glaser and Fristhand, whose opinions were accorded "some weight." (Tr. 25). But in *Blakley,* the Sixth Circuit reiterated the principle that "[i]n appropriate circumstances, opinions from State agency medical...consultants...may be entitled to greater weight than the opinions of treating or examining sources." *Blakley*, 581 F.3d at 409 (quoting Soc. Sec. Rul. 96-6p, 1996 WL 374180, at *3 (July 2, 1996)). A review of the record confirms that this case is one in which substantial evidence supports the ALJ's decisions to dismiss the unsupported opinions of Dr. Ringel, and to give greater weight to the opinions of the consulting physicians.

Plaintiff complains that the ALJ made a factual error when she referred to Dr. Ringel having noted "musculoskeletal and neurological examinations… within normal limits," because that portion of the form was left blank by Dr. Ringel. To the extent that the ALJ overstated Dr. Ringel's "normal" findings, any error was harmless considering Dr. Ringel's failure to complete the form, and other normal findings in the record. Plaintiff also argues that it was error for the ALJ to reject reaching, handling, and fingering limitations because Dr. Ringel based those on Plaintiff's "cervical disc disease and symptoms of radiculopathy," as documented by Dr. Jobalia. However, Dr. Jobalia's records were when Plaintiff was still employed full-time and are not corroborated by imaging studies or other objective records. Thus, substantial evidence supports the ALJ's rejection of such limitations.

Plaintiff also asserts that the ALJ was wrong to discount the extreme limitations Dr. Ringel offered on standing and/or walking, because "it fails to take into consideration that sitting in a work environment can be very different from sitting in a home environment (e.g., straight chair…versus a couch or recliner)," and that standing/walking can also differ at work if one is required "to walk a minimum distance without a place to rest." (Doc. 11 at 25). Last, Plaintiff criticizes the ALJ for failing to mention the fact that the opinions of Dr. Ringel were "largely consistent" with the opinions of examining consultant Dr. Kejriwal. Again, these arguments do not present grounds for reversal. No authority is cited for Plaintiff's arguments concerning the differences in postural limitations at home or at work, and Dr. Kerjiwal's opinions were equally unsupported.

### 4. Credibility Assessment

In his last claim, Plaintiff asserts that the ALJ erred in assessing his credibility. Plaintiff reiterates that the ALJ should have placed greater focus on the financial barriers that Plaintiff faced in receiving treatment, rather than relying on his lack of psychological and medical treatment as evidence of a lack of disabling impairment.

The gaps in Plaintiff's treatment record and lack of psychological treatment were among multiple factors that the ALJ discussed as a basis for her decision. Plaintiff's lack of treatment impacted both his credibility and the analysis of the severity of his impairment. The psychological evidence has been discussed above and need not be repeated. However, the ALJ also noted that Plaintiff's "large gap in musculoskeletal treatment" was consistent with his mild findings on X-ray, and the clinical examinations by several examining physicians, including generally normal findings by Dr. Fritzhand,

despite Plaintiff's refusal to cooperate with that exam. (Tr. 23). In fact, despite allegations of radiating, stabbing pain, multiple imaging studies have failed to reveal any significant pathology in either Plaintiff's lumbar or cervical spines. (Tr. 22). The most significant finding was narrowing at the L1-S1 level, without any evidence of other abnormalities like nerve root compression, and there was no other evidence of neurological deficits on exam. (Tr.23). The ALJ explained:

> Other than his two consultative examinations, the medical evidence reflects very little specific treatment secondary to neck or back pain. Further, the treatment that does exist, failed to document the diagnostic and/or clinical signs typically associated with chronic, severe cervical and lumbar spondylosis, such as nerve root compression, muscle atrophy, decreased range of motion, decreased sensation, or other signs of neurological deficits. Additionally, the claimant has not undergone any type of electro-diagnostic imaging that might substantiate the presence of the radiating pain alleged by the claimant.
>
> In fact, for much of the relevant period, the claimant was not receiving any medical treatment and not taking prescribed medications… The claimant's only true aggressive therapy were injections…during a time that claimant was still driving a truck full-time…

(Tr. 23). Based upon this analysis and the prior analysis regarding Plaintiff's alleged inability to afford treatment, it is clear that the ALJ appropriately considered the record as a whole in evaluating Plaintiff's credibility.

In addition to the relative lack of treatment and few objective or clinical records, all of which undermined Plaintiff's credibility, the ALJ reviewed in some detail the "numerous inconsistent statements" made by Plaintiff that "serve to further belie his claims." (Tr. 23). An ALJ's credibility assessment must be supported by substantial evidence, but "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Com'r of Soc. Sec.*, 127

F.3d 525, 531 (6th Cir. 1997). Further, a credibility determination cannot be disturbed "absent a compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). Thus, it is proper for an ALJ to discount the claimant's testimony where there are contradictions among the medical records, her testimony, and other evidence. *Warner v. Com'r of Soc. Sec.*, 375 F.3d at 392.

The ALJ cited many reasons prior to concluding that Plaintiff's "vague, inconsistent statements and, at times, evasive conduct, significantly erodes his credibility." (Tr. 24). Plaintiff now asserts that two of those statements were "unfairly weighed" by the ALJ – regarding inconsistencies about how his job ended, and whether his medical condition deteriorated after he lost his job. (Doc. 11 at 27). However, the ALJ's credibility analysis was extensive, with detailed and appropriate references to the record and to Plaintiff's statements. (See Tr. 23-25). Plaintiff's contention that the ALJ misconstrued or misinterpreted two of his statements is not cause for remand, even if the undersigned agreed with that assessment, which I do not. Rather than repeating the ALJ's thorough analysis *ad nauseam*, it is sufficient to state that having examined the record, the undersigned finds the assessment of Plaintiff's credibility to be very strongly supported, to a degree well above the "substantial evidence" standard required.

### III. Conclusion and Recommendation

For the reasons explained herein, **IT IS RECOMMENDED THAT** the decision of the Commissioner to deny Plaintiff DIB  benefits be **AFFIRMED** because it is supported by substantial evidence in the record as a whole, and that this case be **CLOSED.**

  */s Stephanie K. Bowman*
  Stephanie K. Bowman
  United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

ROBERT EVERSOLE,                                            Case No. 1:12-cv-592

      Plaintiff,                                            Beckwith, J.

    v.                                                           Bowman, M.J.

COMMISSIONER OF SOCIAL SECURITY,

      Defendant.

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R.  That period may be extended further by the Court on timely motion by either side for an extension of time.  All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections.  A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).